**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DR. FAUZIA KHAN, | |
| *Plaintiff*, | |
| | Case No.1:22-cv-4406 |
| v. | |
| COUNTY OF COOK, d/b/a JOHN H. STROGER, JR., HOSPITAL OF COOK COUNTY, DR. JORELLE ALEXANDER, and DR. KAHINA CALDWELL, | **JURY DEMAND** |
| *Defendants*. | |

## <u>COMPLAINT</u>

Now comes the Plaintiff Dr. Fauzia Khan ("<u>Dr. Khan</u>"), by and through her undersigned counsel, and for her Complaint against Defendant County of Cook, d/b/a John H. Stroger, Jr., Hospital of Cook County ("<u>CCH</u>"), Dr. Jorelle Alexander ("<u>Dr. Alexander</u>"), and Dr. Kahina Caldwell ("<u>Dr. Caldwell</u>"), states as follows:

### NATURE OF THE CONTROVERSY

1.      This action arises out of the intentional and illegal conduct of the Defendants, against a highly experienced and decorated physician – Dr. Fauzia Khan. Defendants discriminated and retaliated against Dr. Khan, an Indo-Pak, Muslim, woman, by assigning her overwhelming amounts of work not given to other non-Muslim, non-Indo-Pak dentists and then retaliating against Dr. Khan when she filed grievances and complaints with her union and various personnel and compliance departments at CCH and Cermak.

2.      CCH and Drs. Alexander and Caldwell then subjected Dr. Khan to the most severe employment punishment that can befall a physician, summary suspension and reporting of the

same to the National Practitioner's Databank maintained by the United States Department of Health and Human Services.

3.       This extreme measure is only to be used when a physician constitutes an immediate and severe threat to patients.  It results in an immediate loss of privileges and ultimately is a professional death penalty for any physician who is subjected to it, as every health care provider in the country refers to the Databank when considering a physician for employment.

4.       Dr. Khan brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq.*, and the Illinois Human Rights Act, 775 ILCS 5/1 *et. seq.*, to redress the acts of employment discrimination and retaliation to which she was subjected. Dr. Khan seeks damages, including exemplary damages, for the injuries she has sustained as a direct and proximate result of Defendants' discriminatory and retaliatory conduct.

## JURISDICTION AND VENUE

5.       The Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 because this action is premised on Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et. seq.*

6.       Venue is proper in this Court under 28 U.S.C. § 1391 because this is the district in which a substantial part of the events or omissions giving rise to the claims occurred.

7.       Dr. Khan was employed by CCH in this judicial district at the time of her termination, and the decisions adverse to Dr. Khan's employment that are the subject of this civil action were made and carried out in this judicial district.

8.       Dr. Khan filed her charge with the EEOC on July 9, 2021(a true and accurate copy of Dr. Khan's EEOC charge is attached hereto as Exhibit A) and was provided a right to sue letter

- 2 -

on May 24, 2022 (a true and accurate copy of Dr. Khan's right to sue letter is attached hereto as Exhibit B). This Complaint is timely filed.

## THE PARTIES

9.  Plaintiff, Dr. Khan, is a woman of Indo-Pak descent and she is Muslim. She is a citizen of the United States, and a resident of the State of Illinois. At all times relevant to this action, and until her termination in 2022, Dr. Khan was employed by CCH.

10.  On information and belief, County of Cook is a municipal corporation organized under the Laws of the State of Illinois and it owns and operates John H. Stroger, Jr., Hospital of Cook County located at 1969 W. Ogden Ave. in Chicago, Illinois.

11.  Defendant, Dr. Jorelle Alexander is an employee of CCH and on information and belief is a resident of Cook County, Illinois.

12.  Defendant, Dr. Kahina Caldwell, was an employee of CCH at all relevant times and on information and belief is a resident of Cook County, Illinois.

## BACKGROUND

**Dr. Khan's Credentials**

13.  Dr. Khan received her D.D.S. from University of Tennessee Health Sciences Center College of Dentistry in Memphis, Tennessee in 2002.

14.  In July of 2003, Dr. Khan completed a General Practice Residency in Dental Medicine at St. John's Medical Center in St. Louis, Missouri, in which she dealt with private practice patients, medically compromised patients, and did rotations in the Emergency Room, Anesthesiology and in Oral Maxillofacial Surgery. Dr. Khan was also named resident of the year.

15.  Dr. Khan then established and operated her solo full service private dental practice from 2004 through 2016, wherein she also treated medically compromised patients.

16.     She was also on staff at Saint Francis Hospital in Bartlett and Saint Francis Hospital on Park Avenue in Memphis, where she was on call for treating patients with dental emergencies.

17.     Dr. Khan is currently licensed to practice dentistry in three states, Missouri, Illinois, and California.  She was previously licensed in Tennessee, but retired that license as she did not intend to practice there after coming to Illinois.  None of her licenses have ever been suspended or revoked and she never had an issue with her staff privileges until CCH.

**Dr. Khan's Employment at Cook County**

18.     Thereafter, with a background in law enforcement and with a desire to help the underserved incarcerated community, Dr. Khan applied to and received an appointment as a General Dentist with Cook County Health and Hospital Systems at its Correctional Facility at Cermak.

19.     Dr. Khan began working for Cook County in February of 2016.  At the time, she had never had a blemish on her record maintained by the Department of Health and Human Services through its National Practitioners Databank.

20.     She did not receive any training from Cook County in any policies or procedures that the County may have had with respect to the treatment of medically compromised patients, consulting with a patient's physician, written clinical notation, prescribing medications, or the taking of x-rays.

21.     Dr. Khan was initially assigned to Division 11, where she treated only male patients who were non-medically compromised, that required simple or surgical extractions, hygiene, exams, or restorative fillings.

22.     Her direct supervisor was Dr. Ronald Townsend.  Shortly after Dr. Khan started working under Dr. Townsend he made multiple misogynistic and anti-Muslim comments to Dr. Khan.

23.     After multiple incidences of this behavior Dr. Khan reported it to Dr. Alexander. Dr. Alexander took no action herself, and instead just gave Dr. Khan the number for corporate compliance.

24.     Dr. Khan went to EEO and Corporate Compliance at CCH and reported Dr. Townsend's behavior.

25.     EEO and compliance investigated Dr. Townsend and he was separated from CCH shortly thereafter.

26.     Shortly after that, Dr. Khan was transferred to Division 6 by Dr. Alexander, where she saw similar types of patients to what she saw in Division 11.

27.     While in Divisions 6 and 11, Dr. Khan would see approximately 2000 patients per year.

28.     At the end of 2017 or in early 2018, Dr. Khan was transferred to Division 8, the Residential Treatment Unit, which houses pregnant females and medically compromised males and females.

29.     When she was transferred to Division 8, she did not receive training in any County policies or procedures for the treatment of medically compromised patients, nor was she given any written policies or procedures as to how to treat medically compromised patients or patients on blood thinners.

30.     Dr. Khan was also assigned Division 5 women and Cermak men and women.  She was the only dentist at Cermak Health Services assigned to see multiple divisions.

- 5 -

31.     Dr. Khan was eventually asked by the head of the Pharmacy Department, Dr. Mary Ann Wrobel, to join the Best Practice and Quality Committee for pharmacy. Dr. Elizabeth Feldman asked Dr. Khan to give a PowerPoint presentation on the treatment of medically compromised patients on anti-coagulants to pharmacists, nurses, PA's and dentists at CCH.

32.     While Dr. Khan was excelling at CCH serving a very high volume of inmates with a great need for oral healthcare, it was an extremely challenging environment in which to work.

33.     As one of the most active dentists at Cermak, Dr. Khan encountered facilities that were sub-standard compared to what she was used to in private practice and at the St. Francis Hospitals, recordkeeping that was ad hoc to non-existent, and staff that were frequently antagonistic, if not downright hostile.

34.     By way of example, the inmate community at Cermak were not provided digital panoramic or digital x-ray equipment that a private citizen in a community like Chicago would have.  Furthermore, after arriving at Cook County, Dr. Khan learned that the County's record-keeping system for x-rays amounted to putting small traditional, conventional films with no patient identifying markings on the films in tiny white envelopes that may or may not identify what was inside the envelope, when it was performed, or what kind of x-ray it was.  All of this was handwritten on the envelope, the film in the envelope was the only copy, such that if it was misplaced, put in the wrong envelope or otherwise mishandled – the x-ray was lost.  It is generally accepted in the field of dentistry that whenever films are taken there are two copies of the film and at most facilities the films are digital.  Dr. Khan noted this significant issue as she treated inmates at Cook County, but was told they could only make one copy and that this was the record-keeping system.

35.     Arguably the most troubling issue Dr. Khan encountered at the jail was the disrespectful manner in which the dental assistants and hygienists were permitted to act and engage with her.  Dr. Khan is of Indo-Pak descent, and Muslim.  Neither her religion, nor her ethnicity had ever before been an issue in her professional life.

36.     At some point Dr. Khan noted that certain staff members engaged her differently than they did her non-Muslim, African-American colleagues.  For example, Dr. Khan would ask an assistant to hand her a piece of equipment while Dr. Khan was working on a patient in the chair, and she would be told by the assistant, "Get it yourself" in front of the patient.

37.     Dr. Khan would request that the dental assistant take x-rays, if undiagnostic, and the assistants would refuse. Dr. Khan would request that a note be made in the medical record regarding an observation she was making contemporaneously while working on a patient and she would be told by the assistant, to create her own note.  Beyond the brazen hostility, this conduct was unprofessional and potentially jeopardized patient care.  Dr. Khan complained via phone calls and emails, to her superiors, Dr. Alexander, the chair of the department, and Dr. Caldwell, the chief of correctional services.

38.     Instead of being told that the assistants would be admonished or instructed on appropriate conduct, Dr. Khan was told that no one else had her experience and she was not believed.  Dr. Khan wrote numerous emails to her union representative, CCH EEO, Corporate Compliance, Dr. Alexander and Dr. Caldwell regarding the auxiliary staff disrespecting her in front of patients and not performing their job duties and creating a hostile work environment.

39.     Dr. Khan pointed out that at the time, every general dentist, assistant and hygienist was African American and none of them were of Indo-Pak descent or Muslim.  Dr. Khan advised

that she believed much of the treatment and hostile environment she experienced was as a result of her race and religion, and national origin.

40.     Over time, the behavior continued and escalated and began occurring in front of not just patients/inmates, but also nurses, deputy sheriffs and correctional officers.  Dr. Khan complained via emails and phone calls, again to her superiors believing now she was being discriminated against, that she had witnesses to the conduct, and that potentially she was being retaliated against.

41.     As the conduct became more pervasive, and the pushback from her superiors became more ardent if not also hostile, Dr. Khan complained to her union by filing multiple grievances which escalated to Step 3 and 4 with human resources at CCH and by notifying EOC at Cook County.

42.     While this was occurring Dr. Khan continued to see the highest number of patients at Cermak and served the most divisions at Cermak, along with serving on the interdepartmental committee dealing with the treatment of patients on anticoagulant medications.

43.     With the increased responsibility, Dr. Khan questioned why she was being assigned the heaviest workloads by Dr. Alexander and Dr. Caldwell.  She saw far more patients than any of the other 15 general dentists in the department.  Dr Khan complained to her union and again to EOC that this was further evidence of discrimination and/or retaliation for her earlier complaints.

**The Performance Improvement Plan**

44.     Following her multiple complaints to multiple parties at CCH regarding the disparate treatment she was experiencing and the hostile work environment, on March 27, 2019, Dr. Khan's supervisor, Dr. Caldwell, sent Dr. Khan a Performance Improvement Plan ("PIP").

45.     The PIP was supposedly issued in response to Dr. Khan's treatment of two patients on anti-coagulants that supposedly suffered post-extraction bleeding.

46.      Before issuing the PIP, Dr. Caldwell did not discuss the treatment at issue with Dr. Khan nor advise Dr. Khan that there was a purported issue with her treatment of any patients.

47.     Dr. Khan emailed Dr. Caldwell and asked for the identity of the patients given she treated thousands of patients per year. Dr. Khan also pointed out that she thoroughly reviews patient's medical histories, medications, consults pharmacy or other providers when necessary, and documents accordingly.

48.     Dr. Khan noted that she was often unable to complete her clinical documentation until her dental assistants completed their portion, which did not timely occur.

49.     Dr. Khan also expressed concern that there was a lack of guidance from management regarding quality assurance and that she felt management's evaluation and current complaints regarding patient care were retaliatory because of grievances she had filed in the recent past.

50.     She also documented issues of non-HIPAA compliance, hostile work environment, and a general lack of response and support from management.

51.     While Dr. Khan objected to being placed on the PIP and believed it was retaliatory she successfully completed the PIP in June of 2019. There were no documented issues or concerns with Dr. Khan's completion of the PIP.

**The Focused Professional Performance Evaluation**

52.     Despite successful completion of the PIP, Dr. Alexander then issued a Focused Professional Performance Evaluation ("FPPE") to Dr. Khan following completion of the PIP.

53.     The FPPE identified the same improvement goals as those that were listed in the PIP, which Dr. Khan had just completed.

54.     Although the FPPE was signed by the Credentials Committee on May 23, 2019, it was not given to Dr. Khan until three weeks later, on June 13, 2019.

55.     The FPPE called for Dr. Khan to complete 16-20 hours of continuing education or Illinois Department of Financial and Professional Regulation peer review to determine competency.

56.     The FPPE further provided that after completion of the continuing education, that Dr. Khan would be directly monitored for her first 25 cases. The length of time identified in the FPPE was 90 days, but it did not specifically delineate if the 90 days applied to the continuing education component, the direct supervision component, or both.

57.     Dr. Khan was told by Dr. Alexander that only the continuing education portion had to be completed within 90 days.

58.     Regardless, by failing to provide the FPPE to Dr. Khan in a timely manner, Dr. Alexander deprived Dr. Khan of 21 days that she was allotted to complete it, nearly one-quarter of the time that was identified.

59.     Dr. Khan began completing the continuing medical education component of the FPPE on her own personal time and placed multiple requests to Dr. Alexander for CME time off to complete the classes.

60.     Dr. Alexander ignored Dr. Khan's requests for time off, until she ultimately denied them nearly two weeks later.

61.     Dr. Khan filed a grievance against Dr. Alexander based on the denial as she believed it was in retaliation for Dr. Khan's response to the PIP where Dr. Khan pointed out the harassing behavior she was being subject to, and Drs. Alexander's and Caldwell's lack of response.

62.     Despite being denied CME time and being deprived of 21 days in which she could complete the courses by Dr. Alexander's untimely tendering of the FPPE, Dr. Khan completed the continuing education component within 90 days of May 23, 2019 and submitted proof of the same to both Dr. Alexander and Dr. Caldwell.

63.     Although Dr. Khan had communicated with both Dr. Alexander and Dr. Caldwell regarding her completion of the continuing education portion of the FPPE, and they were both aware of the classes she had completed, neither one of them ever told Dr. Khan that she was not completing them in a timely manner.

64.     During this period of time, neither Dr. Alexander nor Dr. Caldwell ever came to Dr. Khan's clinic to supervise or observe her treatment of patients, even though both supervisors knew Dr. Khan's schedule and assignments.

65.     Nor was Dr. Khan ever told that the chart audit portion of the FPPE had been completed. In fact, after Dr. Khan submitted proof of completion of the continuing education portion of the FPPE in August of 2019, she was told that Dr. Caldwell would get in touch with her regarding monitoring Dr. Khan performing 25 extractions.

66.     Neither Dr. Caldwell, nor Dr. Alexander ever contacted Dr. Khan about scheduling the 25 extractions as Dr. Khan was told.

67.     Dr. Alexander and Dr. Caldwell never advised Dr. Khan that she failed to timely comply with the FPPE's requirements.

**Dr. Khan Complains and Defendants Eliminate Her**

68.     Dr. Khan became more strident in asserting her rights and filed complaints regarding the discriminatory and retaliatory conduct via the CCH hotline that were recorded and dictated.  She also made multiple complaints to the Cook County Equal Employment Officer, Nick Krasucki.

69.     On or around September 6, 2019, things came to a head when Dr. Khan attended a department meeting led by Dr. Alexander where Dr. Alexander asked the dentists to break out in small groups to discuss ways in which to avoid lawsuits relative to their treatments of dental assistants and hygienists.

70.     Dr. Khan spoke out in her small group, which Dr. Alexander was observing, discussing the treatment Dr. Khan received from the assistants and hygienists.

71.     On September 18, 2019, Dr. Khan met with the Robert Burton of the Office of the Independent Inspector General to again voice her complaints regarding the treatment Dr. Khan was receiving, the response from Drs. Caldwell and Alexander, and the retaliation she believed she was experiencing.  Mr. Burton had Dr. Khan forward him a multitude of emails which it took Dr. Khan the better part of a day to locate and forward.

72.     After meeting with the OIIG, Dr. Khan also complained to the CCH Chief Medical Officer, Dr. Claudia Fegan about the treatment Dr. Khan received and the retaliation that was being brought upon her.

73.     Nine days after Dr. Khan's meeting with OIIG, on September 27, 2019, over one month after Dr. Khan had completed the continuing education component of the FPPE, a time period which would have been more than sufficient for the observation of 25 extractions to be completed, Dr. Alexander issued a Summary Suspension of Dr. Khan's privileges.

74.     Summary Suspension is one of the most severe civil sanctions that can be levied against a physician because of the reporting requirements to the National Practitioner's Databank and the impact it can have on a physician's continued employment.

75.     Dr. Khan was literally escorted out of the facility by law enforcement as if she had committed some sort of crime.

**Summary Suspension**

76.     The September 27, 2019 Summary Suspension was purportedly issued pursuant to Article VII, Section 1 of the Bylaws of the John H. Stroger, Jr. Hospital of Cook County ("Bylaws").

77.     In the Notice of Summary Suspension, Dr. Alexander claimed that the suspension was based upon a clinical review of more than fifteen cases in which Dr. Khan provided care and her purported failure to complete the May 2019 FPPE.

78.     Although Dr. Alexander had a duty to promptly report the Summary Suspension to Peer Review, in violation of that duty, she did not make such a report until November 6, 2019, nearly one month and a half after the Summary Suspension was issued.

79.     Dr. Alexander did not provide any explanation for her violation of the Bylaws prompt reporting requirement.

80.     It is generally known that a health care provider must provide the Databank notice of a summary suspension within 30 days, meaning no action was taken on these allegations until after the summary suspension had to be reported.  The need for urgency is to insure a physician is not improperly reported given the damage a report can do to a physician's career. In this case CCH intentionally or recklessly, delayed, violating its own rules to Dr. Khan's severe detriment.

81.     After the Notice of Summary Suspension was issued, Dr. Khan requested certain materials, including copies of the medical records of the patients supposedly at issue in the Notice of Summary Suspension, and access to her emails to allow her to prepare for the Peer Review process to defend herself against the allegations made by Dr. Alexander.

82.     Dr. Khan was not provided any of the requested materials, but rather, was only allowed a limited amount of time to review limited patient records.

83.     After retaining counsel who demanded that Dr. Khan be permitted to review the relevant records, CCH still refused, only allowing Dr. Khan to see some of the records of the 17 cases and refusing to allow her to make copies or even take notes.  Dr. Khan was provided no access to her emails.

**Peer Review**

84.     On November 8, 2019, the Peer Review Committee contacted Dr. Khan regarding its investigation through its Chair, Dr. Abayomi Akintorin ("Dr. Akintorin").

85.     Dr. Khan scheduled a meeting with Dr. Akintorin for November 13, 2019.   Dr. Akintorin sent Dr. Khan an email confirming that he would meet with her on November 13, 2019 at 11:00 a.m. to discuss the issues involved, the Peer Review process and the applicable by-laws. In his email, Dr. Akintorin also advised that when they met on November 13, they would schedule the time for Dr. Khan's meeting with the Peer Review Committee.

86.     Dr. Akintorin's email also assured Dr. Khan that she would have the opportunity to exchange documents and provide a list of references that she wanted the Committee to meet on her behalf.

87.     At 10:03 a.m. on November 13, 2019, less than one hour before Dr. Khan was scheduled to meet with Dr. Akintorin, he sent her an email stating that she would be meeting with

the Peer Review Committee as opposed to just him. No document exchange had occurred prior to the November 13, 2019 meeting, and other than the Bylaws, Peer Review had provided Dr. Khan with no documents regarding their investigation.

88.     Despite not being provided any documentation regarding Peer Review's investigation, and not being afforded an opportunity to prepare due to Dr. Akintorin's late notice of less than an hour before the scheduled meeting, Dr. Khan met with the Peer Review Committee on November 13, 2019.

89.     Although she was purportedly there to discuss the treatment of patients that was supposedly the basis of the Summary Suspension, Dr. Khan was not asked any questions regarding her treatment of patients.

90.     She was not told that the cases at issue were being reviewed by two allegedly independent dentists, nor was she asked any specific questions about any of the 17 patients that were the subject of the investigation or the purported treatment issues involved.

91.     Instead, she was asked about when she started working at County, a little bit about her background, whether she had filed complaints against her supervisors, her reporting of improper conduct occurring at County to the Inspector General's Office, when she received the FPPE, and the timing of the completion of the requirements of the FPPE.

92.     The meeting was recorded by one of the members of the Committee.

93.     Dr. Khan called Dr. Akintorin later in November or early December to determine the status of Peer Review's investigation.

94.     At that time, Dr. Akintorin advised Dr. Khan that the Committee was still working on it.

95.     Dr. Khan again followed up with Dr. Akintorin in December at which time he advised her that the Committee had found that she had done nothing wrong and was going to recommend exoneration.

96.     Dr. Khan asked Dr. Akintorin to provide her a copy of the Committee's findings and interim report and/or recommendations, and Dr. Akintorin told her that he would.

97.     Dr. Khan never received a copy of the interim report.

98.     Instead, Dr. Akintorin contacted her several days later and told her the EMS had rejected Peer Review's recommendation and directed further investigation, which required that they meet with her again.

99.     On December 17, 2019, after speaking with Dr. Akintorin, Dr. Khan confirmed her availability for a second meeting with Peer Review on December 26, 2019.

100.     At the December 26, 2019 meeting, Dr. Khan was not asked any specific questions about her treatment of the 17 patients.  Nor was she asked anything about how she diagnoses patients, performs extractions, or takes x-rays.  She also was not asked if she would be willing to modify any of her practices.

101.      The Committee again did not disclose that it had commissioned two dentists to conduct a review of the cases at issue.

102.     The Committee did ask her a few questions about antibiotics and why she preferred prescribing Clindamycin.

103.      Dr. Khan explained to the Committee why she preferred Clindamycin and cited peer reviewed materials in support of her position.

104.     She offered to provide the Committee with literature that supported her use of Clindamycin, but the Committee said that would not be necessary.  Dr. Khan never indicated that

she would refuse to follow a policy or directive from her supervisors regarding the prescription of antibiotics.

105.    Again, the meeting was recorded on one of the member's cell phones.

106.    Dr. Khan was never provided any documentation before meeting with the Committee this second time either.

**The Peer Review Report**

107.    On January 3, 2020, the Report of the Peer Review Committee to EMS ("Report") was issued.

108.    Despite a duty to promptly forward the Report to Dr. Khan, it was not sent to her until nearly two weeks later, on January 16, 2020.

109.    The Report identified six areas of concern, and recommended corrective action consisting of a continuation and expansion of the FPPE to include peer proctoring of Dr. Khan's consecutive first 30 patients and a six-month audit of Dr. Khan's cases.

**The EMS Meeting**

110.    Dr. Trevor Lewis' January 16, 2020 letter transmitting the Report to Dr. Khan stated that the Executive Medical Staff ("EMS") would be considering the Report at its next regularly scheduled meeting on February 11, 2020, and that the bylaws permitted her to make a presentation concerning the Report and respond to any questions posed by EMS at the meeting.

111.    Although the letter stated that EMS's deliberations would be in closed session, it did not state that the meeting itself would be in closed session.

112.    The bylaws require EMS to maintain a permanent record of its meetings and proceedings.

113.     On January 24, 2020, Dr. Khan responded to Dr. Lewis' letter and advised that she would attend the EMS meeting and make a presentation.

114.     In her letter, Dr. Khan also requested access to materials that she was denied during the peer review process to prepare for her presentation. These materials included but were not limited to the full medical charts and radiographs of the patients at issue in the investigation, access to her email account, any and all notes and reports of individuals who provided peer opinions, a copy of the Interim Report of the Peer Review Committee, and the recordings of the peer review meetings that she attended.

115.     She also asked that she be allowed to have a representative present at the February 11, 2020 meeting.

116.     Dr. Lewis denied Dr. Khan's requests, and she was provided none of the materials, including but not limited to the medical charts/records.

117.     Dr. Khan renewed her request for the materials required to properly make a presentation to EMS, but once again, Dr. Lewis denied her request.

118.     On February 11, 2020, Dr. Khan appeared before EMS and made a presentation. At the meeting, Dr. Khan was not asked any questions about her treatment of any patients.

119.     The only question she was asked related to the timing of the completion of the FPPE and whether she would be willing to comply with the corrective changes suggested.

120.     Dr. Khan also offered to provide EMS with literature that she had brought with her regarding the use of antibiotics, but EMS did not want it.

121.     Dr. Khan stated she would follow any policy of the Department or Hospital with relation to the administration of antibiotics.

**Notice of Adverse EMS Recommendation and Hearing Rights**

122.     On February 18, 2020, Dr. Khan was sent the Notice of Adverse EMS Recommendation and Hearing Rights.   The Notice stated that EMS voted to reject the recommendations of the Peer Review Committee again and instead voted to recommend termination of Dr. Khan's Medical Staff membership, termination of her clinical privileges, and upholding the summary suspension.

123.     The purported bases of EMS's decision were the issues documented in the Report pertaining to clinical competence, Dr. Khan's alleged reluctance or inability to modify her practice following supervisory input, her statement to EMS and her answers to EMS member questions.

124.     The Notice also delineated that Dr. Khan had the right to request a hearing in connection with EMS's decision.  Dr. Khan timely requested a hearing.

**Notice of Hearing**

125.     On June 2, 2020, Dr. Khan was sent a Notice of Hearing. The Notice was sent to an incorrect address for Dr. Khan, and not in compliance with the Bylaws.   The Notice identified a date for the first prehearing session and the members of the Hearing Committee. In accordance with the Bylaws, Dr. Khan objected to the appointment of Dr. Patel and Dr. Warrior as members of the Hearing Committee based on the fact that they were not trained in dentistry, and to the extent that either participated in the consideration of the matter as EMS members.

126.     Dr. Lewis did not dispute that Dr. Patel and Dr. Warrior were members of the EMS Committee but claimed that Dr. Patel was a non-voting member of EMS, and that Dr. Warrior, while a voting member, was not present for the February 11, 2020 discussion of the Peer Review Report.

127.    Dr. Lewis' letter, however, failed to confirm or deny whether either Dr. Patel or Dr. Warrior, as members of EMS, had access to and/or reviewed the Peer Review Committee's Report or the minutes of the EMS meeting.

128.    Dr. Khan renewed her objection on June 16, 2020.

129.    Dr. Lewis noted her objection but kept Dr. Patel and Dr. Warrior on the Hearing Committee.

130.    Dr. Lewis, did however, remove Dr. James Murphy from the Hearing Committee because he claimed that he "learned that Dr. Murphy is unable to participate as a member of the Hearing Committee."

131.    In lieu of Dr. Murphy, Dr. Lewis appointed Dr. Mary Arlandson to the Hearing Committee.  Dr. Murphy is an oral and maxillofacial surgeon at Cook County and would have brought significant professional knowledge and experience to the panel.

132.    Dr. Khan objected to the removal of Dr. Murphy from the Hearing Committee, and Dr. Arlandson's appointment as a substitute for Dr. Murphy.

133.    Dr. Khan specifically requested Dr. Lewis advise why Dr. Murphy was unable to participate.

134.    Dr. Lewis did not advise Dr. Khan why Dr. Murphy was unable to participate and overruled her objection to Dr. Arlandson's appointment as a substitute for Dr. Murphy.

135.    On information and belief, Dr. Khan asserts that Dr. Murphy was removed from the panel because he reviewed the medical records of the relevant patients and found no deviation from the standard of care and did not recommend summary suspension.

**The Hearing and The Respondent Body's Burden of Proof**

136.    The Bylaws provide that the EMS's burden of proof in this case is as follows:

EMS shall have the initial obligation to present evidence in support of its action or recommendation. The Member shall thereafter have the burden of proving, by clear and convincing evidence, that the adverse action or recommendation either lacks a factual basis or, in considering the factual basis, that the adverse action or recommendation is arbitrary, capricious, or unreasonable. Rebuttal evidence shall be permitted at the discretion of the Hearing Committee Chair.

137. EMS rejected the Peer Review Committee's recommendations twice and instead recommended termination of Dr. Khan's Medical Staff membership on the following bases:

a. Issues documented within the Report of the Peer Review Committee pertaining to Dr. Khan's clinical competence;

b. Dr. Khan's alleged reluctance or inability to modify her practice following supervisory input;

c. Dr. Khan's statement to the EMS Committee; and

d. Dr. Khan's answers to EMS Committee member questions.

**The Patients On Anti-Coagulants**

138. The issue giving rise to the entirety of the underlying proceedings was Dr. Alexander's and Dr. Caldwell's review of two of Dr. Khan's patients – inmates that were on anti-coagulant medication who claimed they suffered bleeding after extractions by Dr. Khan.

139. Even as part of the hearing, CCH continued to refuse to produce the medical records for the patients in question that Dr. Khan needed. Even with the sparse materials she was provided Dr. Khan was able to confirm that one of the inmates that allegedly suffered post-extraction bleeding did not complain of bleeding until one week after the extraction. In addition, the limited records showed that none of the providers who treated the patient noted any active bleeding. In fact, oral surgery saw the patient and found the extraction sites hemostatic with healthy granulation

tissue formation, and that no acute intervention was necessary. The citation to this patient of improper treatment was patent pretext.

140.    Nothing suggested that the alleged bleeding was as a result of the treatment that Dr. Khan rendered as opposed to something the patient did, such as eating hard foods or picking at the site, yet this was one of the central cases that led to Dr. Khan being summarily suspended and reported to the databank as an immediate threat to patients.

141.    After Dr. Khan's complete refutation of the complaint against her surrounding the one bleeding patient, Drs. Alexander and Caldwell moved the goal posts and subsequently took issue with the fact that Dr. Khan did not document any consultation with pharmacy or the primary medical provider regarding the use and/or disuse of the anti-coagulant medications prior to performing an extraction.

142.    CCH claimed that its policies and the standard of care required consultation with pharmacy and/or the primary medical provider prior to performing a procedure. The only evidence of that alleged policy was Dr. Alexander and Dr. Caldwell claiming it to be so.

143.    The Cermak Anticoagulation Clinic guide regarding Bleeding Risk/Dental Procedures did not identify any current policy, nor did Drs. Alexander nor Caldwell produce any evidence establishing that recommendations contained in the guide applied to Dr, Khan's treatment.

144.    Dr. Khan's power-point presentation from 2017/2018 that she was asked to present to all providers in the department regarding treatment of medically compromised patients on anti-coagulants establishes that the Department's protocol recommended consultation with pharmacy or medical providers if the clinician determined that a discontinuation or modification of the anti-coagulation medication was necessary.

145.     In fact, Dr. Khan's presentation corroborated her testimony that clinicians did not need to consult with pharmacy or discontinue or modify anti-coagulant medication administration for an extraction of fewer than three teeth.

146.     Contrary to Dr. Alexander's and Dr. Caldwell's testimony, the evidence established that the guidelines and recommendations followed at the County at the time of the treatment at issue did not require consultation with pharmacy and/or the medical provider prior to the extractions performed by Dr. Khan.

147.     This was confirmed by three separate experts who provided testimony regarding the same to the EMS hearing panel.

148.     The fact that CCH did not have a specific protocol for the treatment of patients on anticoagulant medication requiring a consultation with pharmacy and/or the medical provider at the time Dr. Khan treated the patients at issue was confirmed by Dr. Caldwell.

149.     This was further confirmed by the testimony of Dr. Alexander to the panel wherein she stated that the policy of requiring multidisciplinary meetings for the treatment of patients on anti-coagulants was not in place at the time Dr. Khan performed the extractions for the patients at issue.

**Dr. Khan's Willingness To Modify Her Practice**

150.     Other than Dr. Alexander and Dr. Caldwell's self-serving testimony, there was absolutely no evidence presented to the Hearing Panel that Dr. Khan was reluctant and/or refused to modify her practice. Quite the contrary, Dr. Khan consistently testified that she was willing to modify her practice if directed.  Statements by Defendants to the contrary as a basis to report her to the databank and deny her privileges to the hospital are false and pure pretext.

**Dr. Khan's Statement to the EMS Committee and Answers to EMS Questions.**

- 23 -

151.    Defendants failed to produce any evidence of any statement Dr. Khan made to the EMS or any answer she gave to any questions posed by EMS.

152.    In fact, Dr. Trevor Lewis, the Defendants' sole witness regarding the EMS meeting, offered absolutely no evidence of what Dr. Khan was asked or what she said at the meeting. Dr. Lewis explicitly stated that he did not recall the particulars of Dr. Khan's statements to EMS or the particulars of any questioning from EMS to Dr. Khan.

153.    In fact, he did not remember any particulars of Dr. Alexander's presentation or Peer Review's presentation either. He was unaware of the claimed competency issues raised by EMS regarding Dr. Khan.

154.    Dr. Lewis also did not have any recollection of any statement by Dr. Khan indicating that she would not modify her practice.

155.    Dr. Lewis also claimed that there was no documentation or recording of the meeting, and that no minutes are kept.

**Denial of Dr. Khan's Access to Relevant Information And Violation Of Bylaws**.

156.    Throughout the course of proceedings surrounding the summary suspension, Defendants deprived Dr. Khan access to relevant information on the purported basis that it was privileged pursuant to the Medical Studies Act.

157.    The Medical Studies Act provides in pertinent part as follows:

> § 8-2101. Information obtained. All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of the Illinois Department of Public Health, local health departments, the Department of Human Services (as successor to the Department of Mental Health and Developmental Disabilities), the Mental Health and Developmental Disabilities Medical Review Board, Illinois State Medical Society, allied medical societies, health maintenance organizations, medical organizations under contract with health

maintenance organizations or with insurance or other health care delivery entities or facilities, tissue banks, organ procurement agencies, physician-owned insurance companies and their agents, committees of ambulatory surgical treatment centers or post-surgical recovery centers or their medical staffs, or committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services, ***except that in any health maintenance organization proceeding to decide upon a physician's services or any hospital or ambulatory surgical treatment center proceeding to decide upon a physician's staff privileges, or in any judicial review of either, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based.***

735 ILCS 5/8-2101 (2021) (emphasis added).

158.    Dr. Khan was deprived of relevant medical records and of calling the dentists who purportedly reviewed the cases and presented opinions to the Peer Review Committee as witnesses.

159.    CCH obviously knew that the privilege should not have been asserted and was patently excluded by the statute.  The assertion precluded her from cross-examining and testing the purported opinions relied upon by Peer Review and EMS regarding the quality of her care.

160.    She also was not provided copies of those dentists' reports or opinions. Importantly, she was also not provided the written report of Dr. Murphy, which indicated that she did not present any immediate threat or danger to patients.

**Defendants Violated the Hospital Licensing Act**

161.    The Illinois Hospital Licensing Act ("Act") prescribes the minimum procedures that Hospitals must employ in making decisions regarding medical staff privileges. 210 ILCS 85/10.4 (2021). The Act specifically provides as follows:

> (b) All hospitals licensed under this Act, except county hospitals as defined in subsection (c) of Section 15-1 of the Illinois Public Aid Code, shall comply with, and the medical staff bylaws of these hospitals shall include rules consistent with, the provisions of this Section in granting, limiting, renewing, or denying medical staff membership and clinical staff privileges. Hospitals that require medical staff members to possess faculty status with a specific institution of higher education are not required to comply with subsection (1) below when the physician does not possess faculty status.
>
> * * *
>
> (2) Minimum procedures with respect to medical staff and clinical privilege determinations concerning current members of the medical staff shall include the following:
>
>> (A) A written notice of an adverse decision.
>> (B) An explanation of the reasons for an adverse decision including all reasons based on the quality of medical care or any other basis, including economic factors.
>> (C) A statement of the medical staff member's right to request a fair hearing on the adverse decision before a hearing panel whose membership is mutually agreed upon by the medical staff and the hospital governing board. The hearing panel shall have independent authority to recommend action to the hospital governing board. Upon the request of the medical staff member or the hospital governing board, the hearing panel shall make findings concerning the nature of each basis for any adverse decision recommended to and accepted by the hospital governing board.
>>
>>> (i) Nothing in this subparagraph (C) limits a hospital's or medical staff's right to summarily suspend, without a prior hearing, a person's medical staff membership or clinical privileges if the continuation of practice of a medical staff member constitutes an immediate danger to the public, including patients, visitors, and hospital employees and staff. In the event that a hospital or the medical

staff imposes a summary suspension, the Medical Executive Committee, or other comparable governance committee of the medical staff as specified in the bylaws, must meet as soon as is reasonably possible to review the suspension and to recommend whether it should be affirmed, lifted, expunged, or modified if the suspended physician requests such review. A summary suspension may not be implemented unless there is actual documentation or other reliable information that an immediate danger exists. This documentation or information must be available at the time the summary suspension decision is made and when the decision is reviewed by the Medical Executive Committee. If the Medical Executive Committee recommends that the summary suspension should be lifted, expunged, or modified, this recommendation must be reviewed and considered by the hospital governing board, or a committee of the board, on an expedited basis. Nothing in this subparagraph (C) shall affect the requirement that any requested hearing must be commenced within 15 days after the summary suspension and completed without delay unless otherwise agreed to by the parties. A fair hearing shall be commenced within 15 days after the suspension and completed without delay, except that when the medical staff member's license to practice has been suspended or revoked by the State's licensing authority, no hearing shall be necessary.

* * *

(C-5) All peer review used for the purpose of credentialing, privileging, disciplinary action, or other recommendations affecting medical staff membership or exercise of clinical privileges, whether relying in whole or in part on internal or external reviews, shall be conducted in accordance with the medical staff bylaws and applicable rules, regulations, or policies of the medical staff. If external review is obtained, any adverse report utilized shall be in writing and shall be made part of the internal peer review process under the bylaws. The report shall also be shared with a medical staff peer review committee and the individual under review. If the medical staff peer review committee or the individual under review prepares a written response to the report of the external peer review within 30 days after receiving such report, the governing board shall consider the response prior to the implementation of any final actions by the governing

> board which may affect the individual's medical staff membership or clinical privileges. Any peer review that involves willful or wanton misconduct shall be subject to civil damages as provided for under Section 10.2 of this Act.
>
> (D) A statement of the member's right to inspect all pertinent information in the hospital's possession with respect to the decision.

210 ILCS 85/10.4.3

162.    In this case, Defendants failed to comply with the minimum requirements of the Act regarding summary suspension. First, and the contrary to the Act, Defendants improperly utilized summary suspension as it may only be imposed if the continuation of practice of a medical staff member constitutes an immediate danger to the public.

163.    Second, according to the Act, when a summary suspension is imposed, the reviewing body must meet as soon as is reasonably possible to review the suspension.

164.    The Act also provides that summary suspension may not be implemented unless there is actual documentation or other reliable information that an immediate danger exists, and that the documentation or information must be available at the time the summary suspension decision is made and when the decision is reviewed.

165.    Neither the summary suspension itself, nor the Bylaws contain a provision advising that the member has a right to a fair hearing to be commenced and completed within 15 days.

166.    As egregious, neither the summary suspension itself nor the Bylaws contain a statement of the member's right to inspect all pertinent information in the hospital's possession with respect to the decision.

167.    Dr. Khan was not told that Dr. James Murphy had reviewed the cases at issue and authored a report which he filed with the Peer Review Committee and gave to Dr. Akintorin.

168.    This was particularly prejudicial because Dr. Murphy's report concluded that he saw nothing in his review of the cases that Dr. Khan's treatment put patients in imminent danger.

169.    Despite the fact that Dr. Murphy honestly testified that Dr. Akintorin asked him to review the cases at issue and that he provided a written report to him, Dr. Akintorin denied ever receiving the report.

170.    Further, and despite the existence of Dr. Murphy's written report indicating that Dr. Khan's treatment did not place patients in imminent danger, Dr. Akintorin testified that no written reports were provided to the Peer Review Committee for their consideration.

171.    Defendants' failure to produce Dr. Murphy's written report to Dr. Khan when it was plainly and highly relevant because it established that the standard for imposing summary suspension was not met.

172.    Ultimately, Defendants ignored the recommendations of Dr. Murphy and the Peer Review Committee twice, and elected to terminate Dr. Khan's privileges to practice based on the false and pretextual reasons given for summarily suspending Dr. Khan.

173.    This has had a devastating effect on Dr. Khan's ability to practice dentistry and ruined her professional reputation.

**CCH's Proclivity To Use Peer Review To Silence Health Care Providers Who Speak Up.**

174.    The EMS and CCH generally, have a long history of using the Peer Review Process, and summary suspension, to silence health care providers within the Cook County system that speak out against department chairs, leadership, or internal practices that might draw negative attention to CCH.

175.    CCH has used the Peer Review Process to threaten health care providers in the past even though those providers should not have been subject to disciplinary procedures.

176.    CCH has done this knowing that summary suspension is the equivalent of a professional death penalty for a health care provider, and knowing that the peer review system is

being manipulated to exert improper pressure on a health care provider in fear of ruining or losing his/her career.

177.    CCH has permitted its EMS and Peer Review Committees to deviate from the requirements of both statutes and its own By-Laws to accomplish improper discipline against health care providers who speak out against improper and illegal practices.

## COUNT I
### (Title VII—Discrimination on the Basis of National Origin and Retaliation)

178.    Dr. Khan repeats and realleges paragraphs 1-177 as though fully set forth herein.

179.    Dr. Khan is a member of a protected class based on her national origin as a person of Indo-Pak descent.

180.    Dr. Khan, in all respects, was performing her job in a manner that was consistent with Defendants' practices, policies and standards.

181.    Dr. Khan was treated differently than individuals of non-Indo-Pak descent.

182.    Dr. Khan did not pose a threat to patients or patient care and summary suspension was discriminatory and retaliatory.

183.    Defendants discriminated against Dr. Khan as described above, including but not limited to harassing her, subjecting her to a hostile work environment, summarily suspending her, and ultimately terminating her.

184.    Defendants also retaliated against Dr. Khan as described above.

185.    Defendants' actions were taken with a willful and wanton disregard of Dr. Khan's rights under Title VII.

186.    As a direct and proximate result of said unlawful employment practices and in disregard of Dr. Khan's rights and sensibilities, Dr. Khan has suffered humiliation, degradation,

emotional distress, other consequential damages, in addition to lost wages and lost earning potential.

## COUNT II
### (Title VII—Discrimination on the Basis of Religion and Retaliation)

187.    Dr. Khan repeats and realleges paragraphs 1-177 as though fully set forth herein.

188.    Dr. Khan is a member of a protected class based on her religion.

189.    Dr. Khan, in all respects, was performing her job in a manner that was consistent with Defendants' practices, policies and standards.

190.    Dr. Khan was treated differently than individuals who were not Muslim.

191.    Dr. Khan did not pose a threat to patients or patient care and summary suspension was discriminatory and retaliatory.

192.    Defendants discriminated against Dr. Khan as described above, including but not limited to harassing her, subjecting her to a hostile work environment, summarily suspending her, and ultimately terminating her.

193.    Defendants also retaliated against Dr. Khan as described above.

194.    Defendants' actions were taken with a willful and wanton disregard of Dr. Khan's rights under Title VII.

195.    As a direct and proximate result of said unlawful employment practices and in disregard of Dr. Khan's rights and sensibilities, Dr. Khan has suffered humiliation, degradation, emotional distress, other consequential damages, in addition to lost wages and lost earning potential.

## COUNT III
### (Illinois Human Rights Act —Discrimination on the Basis of Race, National Origin, and Religion and Retaliation)

196.    Dr. Khan repeats and realleges paragraphs 1-177 as though fully set forth herein.

- 31 -

197.    Dr. Khan is a member of a protected class based on her national origin and race as a person of Indo-Pak descent, and her religion as a Muslim.

198.    Dr. Khan, in all respects, was performing her job in a manner that was consistent with Defendants' practices, policies and standards.

199.    Dr. Khan was treated differently than individuals of non-Indo-Pak descent, who were not Muslim and who did not file complaints of discrimination and retaliation with Defendants.

200.    Dr. Khan did not pose a threat to patients or patient care and summary suspension was discriminatory and retaliatory.

201.    Defendants discriminated against Dr. Khan as described above, including but not limited to harassing her, subjecting her to a hostile work environment, summarily suspending her, and ultimately terminating her.

202.    Defendants also retaliated against Dr. Khan as described above.

203.    Defendants' actions were taken with a willful and wanton disregard of Dr. Khan's rights under the Illinois Human Rights Act ("IHRA").

204.    As a direct and proximate result of said unlawful employment practices and in disregard of Dr. Khan's rights and sensibilities, Dr. Khan has suffered humiliation, degradation, emotional distress, other consequential damages, in addition to lost wages and lost earning potential.

WHEREFORE, Plaintiff, Dr. Fauzia Khan, prays that this Court:

A. Enter judgment in favor of Dr. Khan and against Defendants for violations of Dr. Khan's Rights under Title VII, and the IHRA;

B. Declare that the actions of the Defendant constituted unlawful discrimination and retaliation;

C. Award Dr. Khan compensatory damages, including, but not limited to, lost wages and benefits, in such amount as will reasonably compensate her for her losses, and damages for emotional distress;

D. Award Dr. Khan punitive damages in such amount as the trier of fact deems proper for willful and reckless conduct and for deviating from both statutory obligations and its own By-Laws and policies;

E. Award Dr. Khan her costs, attorneys' fees, and non-taxable expenses in this action;

F. A trial by jury on all counts so triable; and

G. Grant Dr. Khan any and all further relief the Court deems fair and just.


Dated: August 18, 2022

By: _____ s/ Robert D. Sweeney _____
Robert D. Sweeney
Nicole E. DiOrio
SWEENEY, SCHARKEY & BLANCHARD LLC
230 West Monroe Street
Suite 1500
Chicago, Illinois 60606
Tel. (312) 384-0500

*Counsel for Plaintiff, Dr. Fauzia Khan*

# EXHIBIT A

Recieved by EEOC CDO July 9, 2021

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 440-2021-05163 |

Illinois Department of Human Rights _____ and EEOC

*State or local Agency, if any*

| Name (Indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Fauzia Khan | (312) 384-0500 | 02/24/1974 |

| Street Address | City, State and ZIP Code |
|---|---|
| 230 W. Monroe, Suite 1500, Chicago, IL 60606 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two are named, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| Cook County Health, Chicago, IL 60612 | 1000+ | (312) 864-6000 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1950 West Polk Street | |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE   ☒ COLOR   ☐ SEX   ☒ RELIGION   ☐ NATIONAL ORIGIN

☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION

☒ OTHER *(Specify)* hostile work environment

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 1/1/2018    Latest

☒ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See attached.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

7/8/21   *Fauzia Khan*
Date   Charging Party Signature

NOTARY – When necessary for State or Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

*Fauzia Khan*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

7/08/21

OFFICIAL SEAL
MELISSA SANCHEZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 09/30/23

Recieved by EEOC CDO July 9, 2021

**ATTACHMENT**

Dr. Fauzi Khan has been a practicing Dentist for the past 19 years. From 2004-2016, Dr. Khan practiced general dentistry at Macon Oral Care in Cordova, Tennessee. Thereafter, with a background in law enforcement and with a desire to help the underserved incarcerated community, Dr. Khan applied to and received an appointment as a General Dentist with Cook County Health and Hospital Systems at its Correctional Facility at Cermak. Dr. Khan began working for Cook County in February of 2016. At the time, she was licensed to practice General Dentistry in three states (Illinois, Missouri and California), and had never had a blemish on her record maintained by the Department of Health and Human Services through its National Practitioners Databank.

At Cook County, Dr. Khan was one of the most active dentists at Cermak, seeing approximately 2000 patients/inmates per year. Being accustomed to private practice, where supplies were rarely in short order, facilities and equipment were equipped with the most modern available, and staff were at will employees who could be terminated without undue delay if there was a shortcoming; however, the jail at Cook County was a very different environment. Dr. Khan encountered facilities that were lacking, recordkeeping that was ad hoc to non-existent, and staff that were frequently antagonistic, if not downright hostile. By way of example, the inmate community at Cermak could not have a digital panoramic or digital x-ray equipment that a private citizen at a substantial dentistry practice in a major metropolitan community like Chicago would have. Furthermore, after arriving at Cook County, Dr. Khan learned that the County's record-keeping system for x-rays amounted to putting small traditional, conventional films with no patient identifying markings on the films in tiny white envelopes that may or may not identify what was inside the envelope, when it was performed, or what kind of x-ray it was. All of this was handwritten on the envelope, the film in the envelope was the only copy such that if it was misplaced, put in the wrong envelope or otherwise mishandled – the x-ray was lost. It is generally accepted in the field of dentistry that whenever films are taken there are two copies of the film and at most facilities the films are digital. Dr. Khan noted this significant issue as she treated inmates at Cook County, but was told they could only make one copy and that this was the record-keeping system.

Arguably the most troubling issue Dr. Khan encountered at the jail was the disrespectful manner in which the dental assistants and hygienists were permitted to act and engage with her. Dr. Khan is of Indo-Pak descent, and Muslim. Neither her religion, nor her ethnicity had ever been an issue in her professional life. At some point Dr. Khan noted that certain staff members engaged her differently than they did her non-Muslim, African-American colleagues. For example, Dr. Khan would ask an assistant to hand her a piece of equipment while Dr. Khan was working on a patient in the chair, and she would be told by the assistant to "Get it yourself" in front of the patient. Dr. Khan would request the dental assistant that x-rays be re-taken, if undiagnostic, and they would refuse. Dr. Khan would request that a note be made in the medical record regarding an observation she was making contemporaneously while working on a patient and she would be told by the assistant, to create her own note. Beyond the brazen hostility, this conduct was unprofessional and potentially jeopardized patient care. Dr. Khan complained via phone calls and emails, to her superiors, Dr. Jorelle Alexander, the Chair of the Dept of Oral Health at CCHHS, and Dr. Kahina Caldwell, the Chief of Correctional Services at Cermak for the Dept of Oral Health. Instead of being told that the assistants would be admonished or instructed on appropriate conduct, Dr. Khan was told that no one else had her experience and she was not believed. Dr. Khan wrote numerous emails to her Union Rep, CCH EEO -Corporate Compliance, Dr. Alexander and Dr. Caldwell regarding the auxiliary staff disrespecting her in front of patients and not performing their job duties and creating a hostile work environment. Dr. Khan observed that at the time every general dentist, assistant and hygienist was African American and none of them were of any other ethnicity or Muslim. Dr. Khan was extremely busy, went

Recieved by EEOC CDO July 9, 2021

back to work seeing patients and decide to just deal with it herself since there was no support from leadership.

The behavior continued and escalated and now happened in front of not just patients/inmates, but also nurses, deputy sheriffs and correctional officers. Dr. Khan complained via emails and phone calls, again to her superiors believing now she was being discriminated against, that she had witnesses to the conduct, and that potentially she was being retaliated against. As the conduct became more pervasive, and the pushback from her superiors became more ardent if not also hostile, Dr. Khan complained to her Union by filing multiple grievances which escalated to Step 3 and 4, with Human Resources at Cook County Hospital and by notifying EOC at Cook County. Dr Khan also complained and spoke to the Office of the Inspector General and the Chief Medical Officer at Stroger, Dr. Claudia Fegan about what was transpiring.

While this was going on Dr. Khan was continuing to see the highest number of patients at Cermak and servicing the most divisions at Cermak. The other Cermak dentists were only assigned 1 division. Dr. Khan was assigned to Division 5 women, Division 8 men and women, and Cermak Hospital men and women. She was also invited to Chair an interdepartmental committee dealing with the best practices with the Cermak Pharmacy department for provision of dental services to patients who were taking anticoagulation medicines. With the increased responsibility, Dr. Khan questioned why she was being assigned the heaviest workloads by Dr. Alexander and Dr. Caldwell – she saw far more patients than any of the other 15 general dentists in the department. Dr Khan complained to her Union and again to EOC that this was further evidence of discrimination and/or retaliation for her earlier complaints. Ironically, following that complaint about the disparate treatment she was receiving, she was contacted by Dr. Alexander and told she was being placed on a Performance Improvement Plan ("PIP") as a result of her treatment of patients on anticoagulation medications and her prescription of antibiotics. Dr. Khan disputed that she should be on a PIP, but complied with the terms set out by her chair, Dr. Alexander.

After Dr. Khan completed the PIP, Dr. Alexander approached Dr. Khan again in June of 2019, this time advising Dr. Khan that the credentialing committee wanted to place Dr. Khan on a Focused Professional Practice Evaluation ("FPPE"). When Dr. Khan was handed the document, Dr. Khan noted to Dr. Alexander that the FPPE was actually dated almost a month earlier. Dr. Alexander advised Dr. Khan that she still only had 90 days from May to complete the FPPE. Dr. Khan complained again to her Union and EEO regarding the illegal discrimination and retaliation she was experiencing, but ultimately, having no recourse, complied with the FPPE and disclosure requirements identified in the FPPE regarding her compliance. Dr. Khan inquired several times regarding monitoring of procedures required under the FPPE but received no response from Drs. Alexander or Caldwell. At the close of the FPPE period, no change took place in Dr. Khan's circumstance or privileges.

Approximately one month later, Dr. Khan was advised by Dr. Alexander that she was being summarily suspended – meaning Dr. Khan constituted an immediate threat to patient care and safety – even though Dr. Khan had not been doing extractions since the implementation of her FPPE. Dr. Khan was suspended from the facility with pay and forced to defend herself via Cook County's peer review program. Subsequently, Dr. Khan was interviewed by the Peer Review Committee at Cook County Hospital, as well as others who may have had knowledge of her circumstances. Dr. Khan was contacted by the Chair of the Peer Review Committee, Dr. Abayomi E. Akintorin, at the conclusion of Peer Review's investigation and advised that the Peer Review Committee was making its preliminary report to the Executive Medical Staff and recommending that Dr. Khan be exonerated. Dr. Khan believed she would be returned to practice shortly thereafter and that any report made to the National Practitioner's Databank would be removed. Instead, at some point thereafter Dr. Akintorin contacted Dr. Khan and told Dr. Khan that the Executive

Recieved by EEOC CDO July 9, 2021

Medical Staff, of which Drs. Alexander and Caldwell were members, did not accept the Peer Review Committee's recommendation and the Committee was told to investigate further.

Dr. Khan subsequently learned that the Peer Review Committee, or potentially the Executive Medical Staff, requested that James A. Murphy, DDS, MD, an oral and maxillofacial surgeon, review a host of cases that had not been identified to Dr. Khan to determine whether Dr. Khan's treatment met the standard of care. Dr. Khan was advised that Dr. Murphy also found that her care met the standard of care and that he reported the same to the Peer Review Committee. Peer Review never confirmed Dr. Murphy's involvement nor provided Dr. Khan with a copy of his report. Sometime thereafter, Dr. Khan was advised that the Peer Review Committee was now recommending that the Summary Suspension be upheld and that Dr. Khan's privileges be withdrawn, completely contrary to Dr. Murphy's findings and recommendations.

Dr. Khan was permitted to make a statement to the Executive Medical Staff prior to its vote on the Peer Review Committee's reversal of its prior recommendation. Dr. Khan appeared before the Executive Medical Staff, was asked no questions, was shown no slides nor opinions that suggested that her treatment was below the standard of care, and heard no testimony to that effect. Dr. Alexander made the case for summary suspension to the Executive Medical Staff outside of Dr. Khan's presence. While Dr. Khan was told the meeting was recorded, she was never provided a transcript or other memorialization of what transpired. Following the meeting. Dr. Khan was advised that the Executive Medical Staff was upholding the summary suspension of her privileges and that she would not be permitted to perform further procedures at Cook County, subject to the review of the matter by a designated hearing committee selected by the Executive Medical Staff.

Dr. Khan exercised her right to appeal the decision of the Executive Medical Staff to the hearing committee which originally had Dr. James Murphy as one of the three hearing committee members. Dr. Khan was subsequently advised that Dr. Murphy was withdrawing from the hearing committee and would be replaced by a surgeon with no dental background. The reason for the recusal was never given to Dr. Khan even though she requested an explanation.

As part of the hearing committee process, Dr. Khan was entitled to documents necessary to defend herself. Dr. Khan requested a host of materials to meet this burden, but was provided very few. By way of example, Dr. Khan was not provided her email communications with Drs. Alexander nor Caldwell; she was not provided a copy of the Peer Review Committee's interim report and in fact, was told no such report existed (it was subsequently "found" and turned over to Dr. Khan toward the end of the hearing process); she was not provided with a copy of Dr. Murphy's report, and again was told no such report existed; she was not provided with any notes or records kept by the Peer Review Committee; she was not provided medical records from the Cermak facility; she was not provided with the actual tangible x-rays for the relevant patients; and further Dr. Khan was advised that the number of problematic patients that warranted summary suspension of her privileges had grown and was now greater than what she had been originally told and what the Peer Review Committee investigated.

The hearing was prosecuted by Drs. Alexander and Caldwell. They also served as the only witnesses with experience in the relevant field who opined during the hearing that Dr. Khan should have her privileges summarily suspended. In essence, Drs. Alexander and Caldwell continued their discriminatory and retaliatory conduct through the hearing process making up allegations against Dr. Khan with the intent of insuring that Dr. Khan lose her privileges at CCHHS and be terminated.

Dr. Khan has been discriminated and retaliated against by Drs. Alexander, Caldwell and Cook County through the sham peer review process that was initiated and prosecuted against her as a result of

3

Recieved by EEOC CDO July 9, 2021

her attempts to stand up to the illegal processes which were taking place, and through the continuing attacks on her competence as a general dentist with nearly two decades of experience.

# EXHIBIT B

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

May 24, 2022

Ms. Fauzia Khan
c/o Nicole E. DiOrio, Esquire
Law Offices of Sweeney, Scharkey & Blanchard
230 West Monroe Street
Suite 1500
Chicago, IL  60606

Re:  EEOC Charge Against Cook County Health & Hospitals
      No. 440202105163

Dear Ms. Khan:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC Chicago District Office, Chicago, IL.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                                Sincerely,

                                Kristen Clarke
                              Assistant Attorney General
                                Civil Rights Division

                         by       /s/ Karen L. Ferguson
                                Karen L. Ferguson
                            Supervisory Civil Rights Analyst
                            Employment Litigation Section

cc: Chicago District Office, EEOC
  Cook County Health & Hospitals